**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| JOGEANIA ADKINS, | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | CAUSE NO. 1-14-CV-082-LY |
| | § | |
| AT&T UMBRELLA BENEFIT PLAN | § | |
| NO. 1, | § | |
| DEFENDANT. | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:   THE HONORABLE LEE YEAKEL
       UNITED STATES DISTRICT JUDGE

Before the Court are Defendant's Motion for Summary Judgment and Brief in Support, filed November 3, 2014 (Clerk's Dkt. No. 19); Plaintiff's Motion for Summary Judgment, filed November 3, 2014 (Clerk's Dkt. No. 21); Defendant's Response to Plaintiff's Motion for Summary Judgment, filed November 17, 2014 (Clerk's Dkt. No. 22); Plaintiff's Response to Defendant's Motion for Summary Judgment, filed November 17, 2014 (Clerk's Dkt. No. 23); Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment, filed December 1, 2014 (Clerk's Dkt. No. 25); and Defendant's Reply in Support of its Motion for Summary Judgment, filed December 1, 2014 (Clerk's Dkt. No. 26).

The motions were referred by United States District Judge Lee Yeakel to the undersigned for a Report and Recommendation as to the merits pursuant to 28 U.S.C. § 636(b), Rule 72 of the Federal Rules of Civil Procedure, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas.  Having considered the briefing and applicable case law, it is respectfully recommended that Defendant's Motion for Summary Judgment

(Clerk's Dkt. No. 19) be **GRANTED** and Plaintiff's Motion for Summary Judgment (Clerk's Dkt. No. 21) be **DENIED** for the reasons set forth below.

## I. BACKGROUND

Plaintiff Jogeania Adkins ("Adkins") brings this action against Defendant AT&T Umbrella Benefit Plan No. 1 ("Defendant"). Adkins was employed as a leveraged service representative for AT&T/Southwestern Bell Telephone Company. (Clerk's Dkt. No. 20 "CF" Ex. 1 at 279). She alleges she became disabled and unable to perform her job functions on September 24, 2012. (CF at 1–2, 7–9). Adkins therefore sought and was approved for short-term disability benefits under her benefit plan ("the Plan") with Defendant. (CF at 1, 101). On February 11, 2013, Sedgwick Claims Management Services, Inc. ("Sedgwick"), the claims administrator and named fiduciary for the Plan, terminated Adkins' short-term disability benefits following a determination that her impairments were not severe enough to keep her from returning to work. (CF at 174). Adkins appealed Sedgwick's decision, but her appeal was denied. (CF at 308–10). By way of this action, Adkins challenges the determinations concerning the short-term disability benefits due to her under the Plan and seeks the maximum benefits, which would have extended through September 30, 2013.[1]

Adkins and Defendant have now filed motions for summary judgment, responsive pleadings, and the Claim File of the administrative proceedings previously conducted. The matters are now ripe for determination.

---

[1] Adkins concedes she could only be awarded short-term disability benefits at this stage because she must engage in the claim and appeal process through Sedgwick before she can potentially litigate a long-term disability benefits issue in federal court. The undersigned therefore will not herein address Adkins' eligibility for long-term disability benefits.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)).  The Court will view the summary judgment evidence in the light most favorable to the non-movant. *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Davis v. Fort Bend Cty.*, 765 F.3d 480, 484 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 323; *Celtic Marine Corp. v. James C. Justice Co., Inc.*, 760 F.3d 477, 481 (5th Cir. 2014). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Celtic Marine*, 760 F.3d at 481 (citing *Celotex*, 477 U.S. at 325).  Once the non-movant has been given the opportunity to present evidence to create a genuine issue of fact, the court will grant summary judgment if no reasonable juror could find for the non-movant. *Boos v. AT&T, Inc.*, 643 F.3d 127, 130 (5th Cir. 2011).

3

### III.  SUMMARY JUDGMENT EVIDENCE

The parties do not dispute the contents of the Claim File.    The Claim File is composed of AT&T and Sedgwick's administrative decisions and Adkins' medical records dating from Adkins' initial claim for short-term disability benefits, through the final termination of her short-term disability benefits.

**A.      The Plan**

The Plan is an employee disability welfare benefit plan sponsored by Adkins' employer and governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 10001 *et seq*. The Plan provides short-term disability benefits if a claimant is found by Sedgwick to be totally or partially disabled within the meaning of the Plan's terms.  (Ex. 2 "Plan" at 10).  "Totally disabled" under the Plan means "because of Illness or Injury, you are unable to perform all of the essential functions of your job or another available job assigned by your Participating Company with the same full-time or part-time classification for which you are qualified." (Plan at 11).  The Plan confers to Sedgwick the discretion to determine whether a claimant has a disability that qualifies for short-term disability benefits and states that the abuse of discretion standard applies to federal court review of a determination.  (Plan at 12, 26, 28, 33, 34, 62, 73).  The Plan is self-funded and any disability benefits are paid directly from the Plan.  (Plan at 33).  Short-term disability benefits can be received for a maximum of 52 weeks.  (Plan at 9).

**B.      Hospitalization and Initial Receipt of Benefits**

Adkins was employed by AT&T as a leveraged service representative, a sedentary job with no physical requirements.  (CF at 2, 35, 279).  Adkins was hospitalized on September 24, 2012 for body swelling, aching, fever, and low blood pressure and remained in the hospital until October 12,

2012.  (CF at 12).  Adkins filed a claim for short-term disability benefits beginning on September 24, 2012.  (CF at 1–2, 7–9).  In support of Adkins' claim, rheumatologist Dr. Paul Pickrell ("Dr. Pickrell") submitted a physician statement based on his evaluation of Adkins while she was admitted to the hospital.  (CF at 98).  Dr. Pickrell's physician statement listed Adkins' diagnoses as gastroparesis,[2] systemic lupus,[3] and chronic myofascial pain[4] with symptoms of total body pain, swelling and stiffness of joints, fatigue, and difficulty concentrating.  (CF at 98).  His statement further indicated that Adkins was unable to sit or stand for more than ten minutes at a time.  (CF at 98).

On October 11, 2012, Adkins was approved for short-term disability benefits spanning from September 24, 2012 through October 28, 2012.  (CF at 11, 101).  The approval was based on her inability to work because she was in the hospital and going "in and out" of the Intensive Care Unit due to her blood pressure problems and body swelling.  (CF at 11).  Adkins was advised that updated medical documentation would be required to extend her benefits beyond October 28, 2012.  (CF at 101).

---

[2] Gastroparesis is a condition wherein the stomach's ability to empty its contents is reduced.  Diabetics risk developing gastroparesis.  Symptoms include abdominal distention, hypoglycemia, nausea, premature abdominal fullness after meals, weight loss, and vomiting.  *Gastroparesis*, NAT'L INST. OF HEALTH (Oct. 8, 2012), http://www.nlm.nih.gov/medlineplus/ency/article/000297.htm.

[3] Systemic lupus is a disease wherein the immune system mistakenly attacks healthy cells and tissues, which can cause damage to joints, skin, blood vessels, and organs.  Common symptoms include joint pain and swelling, muscle pain, fever, fatigue, and rashes.  *Systemic Lupus Erythematosus*, NAT'L INST. OF HEALTH (Jan. 12, 2015), http://www.nlm.nih.gov/medlineplus/ency/article/000435.htm.

[4] Myofascial pain syndrome is a chronic pain disorder wherein pressure on sensitive points of the muscles triggers seemingly unrelated pain in other parts of the body.  *Myofascial Pain Syndrome*, MAYO CLINIC: DISEASES AND CONDITIONS (Dec. 9, 2014), http://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/basics/definition/CON-20033195?p=1.

**C.      Treating Physicians' Reports and the Continuation of Benefits**

On October 22, 2012, Adkins saw Dr. Pickrell for a followup rheumatology consultation. (CF at 106).   Dr. Pickrell's report indicated Adkins had been placed on corticosteroids[5] and discharged from the hospital in good condition, but that it has been impossible for her to return to work yet.  (CF at 106).  He noted that Adkins reported she had profound fatigue and achy joints and muscles.  (CF at 106).  Dr. Pickrell assessed Adkins with mixed connective tissue disease with overlapping features of systemic lupus and Sjögren's syndrome[6] (sometimes referred to as "overlap syndrome"), but observed that her exam remains relatively unremarkable "no doubt in part due to the masking effects of the corticosteroids."  (CF at 107).  He also assessed Adkins with chronic myofascial pain and commented that she was prescribed a combination of oxymorphone,[7] gabapentin,[8] and Lunesta.[9]  (CF at 107).

---

[5]  Corticosteroids are often used to treat arthritis by reducing inflammation.  *Steroids*, NAT'L INST. OF HEALTH (Apr. 7, 2014), http://www.nlm.nih.gov/medlineplus/steroids.html.

[6]  Sjögren's syndrome is a disease that causes dryness in the mouth and eyes, and is sometimes linked with rheumatic problems like rheumatoid arthritis (defined *infra* n.16).  *Sjögren's Syndrome*, NAT'L INST. OF HEALTH (Jan. 7, 2014), http://www.nlm.nih.gov/medlineplus/sjogrenssyndrome.html.

[7]  Oxymorphone is a narcotic analgesic (pain relief medication) for moderate to severe pain.  *Oxymorphone*, NAT'L INST. OF HEALTH (Jan. 26, 2015), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a610022.html.

[8]  Gabapentin is an anticonvulsant that relieves pain by changing how the body senses pain, and may also be prescribed for diabetic neuropathy (numbness or tingling caused by diabetic nerve damage) and hot flashes.  *Gabapentin*, NAT'L INST. OF HEALTH (Jan. 26, 2015), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html.

[9]  Lunesta is a brand of narcotic sleep aid used to treat insomnia and other sleep disorders.  *Eszopiclone*, NAT'L INST. OF HEALTH (Jan. 26, 2015), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605009.html.

On October 29, 2012, Sedgwick declined to extend further benefits to Adkins.[10]  (CF at 14). On November 5, 2012,[11] Dr. Pickrell submitted another physician statement to Sedgwick.  (CF at 104).  In the report, Dr. Pickrell reiterated his diagnosis that Adkins had systemic lupus, swelling of the joints, dry eyes and mouth, headaches, fever, and self-reported fatigue and pain.  (CF at 104). Dr. Pickrell described Adkins' functional limitations as fatigue and limited mobility, and indicated that he had observed swollen joints at Adkins' October 22, 2012 appointment.  (CF at 104).

After receiving Dr. Pickrell's additional physician statement, on November 9, 2012, Sedgwick retroactively applied benefits to October 29, 2012 and extended them through December 3, 2012.  (CF at 108).  Sedgwick notified Adkins that if she was unable to return to work after December 3, 2012, she would need to submit updated medical documentation to extend her benefits. (CF at 108).

On November 26, 2012, Adkins saw Dr. Pickrell for a followup appointment.  (CF at 113). According to Dr. Pickrell's progress note, Adkins reported she had overwhelming fatigue and was having difficulty with simple tasks of everyday living.  (CF at 113).  Dr. Pickrell's joint survey showed slight fullness across Adkins' fingers and wrists, but that he "would be hard pressed to say it is truly synovitis[12] as opposed to just edema.[13]"  (CF at 113).  He also assessed that Adkins had

---

[10] It is unclear why benefits were terminated on this date.  However, the decision was later reversed and benefits were retroactively applied so as to remain continuous.  Therefore, the undersigned will not assess the consequences of this termination.

[11] Defendant lists the date of submission as November 4, 2012.  However, the time stamp on the document is November 5, 2012.

[12] Synovitis is a condition wherein the lining of the joints (synovium) becomes inflamed and usually causes pain.  *Synovitis*, MERRIAM-WEBSTER DICTIONARY, http://www.merriam-webster.com/dictionary/synovitis (last visited Feb. 8, 2015).

[13] Edema is swelling caused by fluid in the body's tissues. *Edema*, NAT'L INST. OF HEALTH (Apr. 24, 2014), http://www.nlm.nih.gov/medlineplus/edema.html.

overlap syndrome refractory to steroid withdrawal, due to the adjustment of her corticosteroid prescription, a high CCP antibody on serologies,[14] and elevated ANA, SSA, and SSB antibodies.[15] (CF at 113).   Dr. Pickrell further noted that Adkins' overlap syndrome reflects a blend of rheumatoid-like[16] activities and Sjögren's syndrome qualities, and that he suspected the antimalarials[17] Adkins was prescribed did not have sufficient time to provide much benefit.  (CF at 113).   He remarked that she still had chronic myofascial pain and remained on oxymorphone, gabapentin, and Lunesta.  (CF at 113).  He also noted that Adkins had obstructive sleep apnea.[18]  (CF at 113).  He continued to treat her with Plaquenil[19] and prednisone.[20]  (CF at 113–14).

---

[14] High CCP (cyclic citrullinated peptide) serologies are indicative of rheumatoid arthritis.  *Test ID: CCP*, MAYO CLINIC, http://www.mayomedicallaboratories.com/test-catalog/Clinical+and+Interpretive/84182 (last visited Feb. 8, 2015).

[15] ANA is a medical abbreviation for antinuclear antibody, which are substances produced by the immune system that attack the body's own tissues.  *Antinuclear Antibody Panel*,  NAT'L INST. OF HEALTH (Jan. 12, 2015) http://www.nlm.nih.gov/medlineplus/ency/article/003535.htm.  Positive SSA and SSB antibodies occur in patients with several different connective tissue diseases, including lupus and  Sjögren's syndrome. C. Dennehey, M.D., *Sjogrens and Systemic Lupus Erythematosis*, LUPUS INT'L,  http://www.lupusinternational.com/About-Lupus-1-1/Lupus-and-Sjogrens-Syndrome-.aspx (last visited Feb. 8, 2014).

[16] Rheumatoid arthritis causes pain, swelling, stiffness, and loss of function in the joints.  *Rheumatoid Arthritis*, NAT'L INST. OF HEALTH  (Jan. 7, 2014), http://www.nlm.nih.gov/medlineplus/rheumatoidarthritis.html.

[17] Antimalarials are often used to treat lupus in conjunction with steroids because of their joint-pain reducing qualities and because they decrease autoantibody production.  *Medications to Treat Lupus*, LUPUS FOUND. OF AM. (Jul. 12, 2013), http://www.lupus.org/answers/entry/medications-to-treat-lupus.

[18] Obstructive sleep apnea is a disorder wherein breathing pauses while sleeping because the airway has become narrowed or partially blocked.  Factors such as a short lower jaw, shape of the palate, large neck size, large tongue, and obesity may increase the risk of obstructive sleep apnea.  *Obstructive Sleep Apnea*,  NAT'L INST. OF HEALTH (Jan. 12, 2015), http://www.nlm.nih.gov/medlineplus/ency/article/000811.htm.

[19] Plaquenil is the brand-name of an antimalarial (defined *supra* n.8), generically called hydroxychloroquine.  *See Hydroxychloroquine*,  NAT'L INST. OF HEALTH (Jan. 26, 2015),  http://www.nlm.nih.gov/medlineplus/druginfo /meds/a601240.html.

[20] Prednisone is a corticosteroid used to treat the symptoms of low corticosteroid levels, or conditions such as certain types of arthritis and lupus.  Side effects include headache, dizziness, difficulty sleeping, extreme changes in mood, extreme tiredness, and increased sweating. *Prednisone*, NAT'L INST. OF HEALTH (Jan. 26, 2015), http://www.nlm.nih.gov/medlineplus /druginfo/meds/a601102.html.

On November 29, 2014,[21]  Dr. Pickrell submitted a physician statement to Sedgwick that stated "see progress notes," in reference to his progress notes taken of the November 26, 2012 followup appointment. (CF at 112).  On December 5, 2013, Adkins was notified that her short-term disability benefits would be extended through January 20, 2013, but she would need to submit updated medical documentation to extend her benefits beyond that date.  (CF at 119).

Dr. Pickrell saw Adkins for another followup appointment on January 14, 2013.  (CF at 121). He recounted that Adkins' serologies showed presence of high-titer ANA, SSA, and SSB antibodies. (CF at 121).  He noted that Adkins reported severe pain the month prior, but that her joint pain improved once her prednisone intake was increased to 15 milligrams daily, although the increase purportedly caused her emotional distress.  (CF at 121).  He also observed that Adkins had significant temperature dysregulation and had a hot flash during the appointment.  (CF at 121).

Dr. Pickrell's joint survey demonstrated slight fullness in Adkins' joints of her fingers, wrists, knees, and feet.  (CF at 121).  He documented Adkins' history of overlap syndrome, chronic myofascial pain, and obstructive sleep apnea.  (CF at 121).  He again concluded that antimalarials alone were insufficient to allow tapering of the corticosteroids and added 15 milligrams of methotrexate[22] weekly.  (CF at 121).  On January 21, 2013, short-term disability benefits were extended through February 10, 2013, and Adkins again was advised she would need to submit updated medical documentation to extend her benefits beyond that date.  (CF at 122).

---

[21]  Defendant lists the date of submission as November 27, 2012.  However, the time stamp on the document is November 29, 2012.

[22]  Methotrexate is sometimes used to treat severe active rheumatoid arthritis, wherein the body attacks its own joints and causes pain, swelling, and loss of function. *Methotrexate*, NAT'L INST. OF HEALTH (Jan. 26, 2015), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682019.html.

On February 6, 2013, Dr. Pickrell saw Adkins for another followup appointment.  (CF at 202).  The February 6, 2013 report was similar to the January 14, 2013 report, with several additions.  First, the report added that Adkins experienced chest discomfort, and went to the emergency room as a result.  (CF at 202).   A CT scan[23] and EKG[24] were performed, but the ER physician told Dr. Pickrell that they could find no discrete pathology.  (CF at 202).   Dr. Pickrell noted that he tends to agree with the ER physician's opinion that Adkins' discomfort may be caused by mild pleurisy[25] from her lupus.  (CF at 202).   According to Dr. Pickrell, the ER physician gave Adkins 60 milligrams of prednisone and she felt much better.  (CF at 202).   Dr. Pickrell observed at the appointment that Adkins was tender on palpitation over the left anterior chest.  (CF at 202).

Second, Dr. Pickrell commented that Adkins' hips, knees, ankles, and feet show fair mobility, but she has slight fullness in her fingers and wrists and tenderness throughout. (CF at 202).  Third, he opined that Adkins had depression "no doubt in part fueled by alteration in corticosteroid taper." (CF at 202).  Adkins reported that she was quite emotional because she loved her job and made excellent money, but cannot return to gainful employment due to the degree of pain and fatigue she was having.  (CF at 202).

---

[23]  A CT scan, or computed tomography scan, is an imaging test that uses x-ray equipment to take cross-sectional photographs of the body.  CT scans are often used to detect cancers, blood clots, heart disease, and internal bleeding.  *CT Scans*, NAT'L INST. OF HEALTH (Jul. 7, 2014), http://www.nlm.nih.gov/medlineplus/ctscans.html.

[24]  An EKG, or electrocardiogram, is a test that records and reports the electrical activity of the heart.  *Electrocardiogram*, NAT'L INST. OF HEALTH (Jan. 12, 2015), http://www.nlm.nih.gov/medlineplus/ency/article/003868.htm.

[25]  Pleurisy is inflammation of the pleura, the thin tissue wrapping the outside of the lungs and lining the inside of the chest cavity.  Sufferers of pleurisy experience sharp pain when breathing.  *Pleural Disorders*, NAT'L INST. OF HEALTH (Jun. 23, 2014), http://www.nlm.nih.gov/medlineplus/pleuraldisorders.html.

D.      **First Medical Record Review and Termination of Benefits**

Sedgwick submitted Adkins' medical records to Network Medical Review Co., Ltd. ("NMR"), an independent company that provides physician reviews regarding ERISA cases, for a determination of whether Adkins was disabled within the meaning of the Plan.  On February 15, 2013, Dr. Neal J. Sherman ("Dr. Sherman"), a medical doctor board certified in internal medicine, reviewed Adkins' medical records.  (CF at 147–49).  Dr. Sherman noted that Adkins had a sedentary job, and was under treatment for an overlap syndrome with symptoms primarily consisting of rheumatoid and lupus presentation.  (CF at 147).  He indicated that her symptoms included fatigue, chronic myofascial pain, and nausea related to gastroparesis.  (CF at 147).  He further reported her history of hypothyroidism,[26] obstructive sleep apnea, and GERD.[27]  (CF at 147).

Dr. Sherman recounted that Adkins was hospitalized recently for poorly controlled hypertension[28] and had "experienced emotional lability due to her steroid treatment."  (CF at 147).  He noted that Adkins' last documented visit with Dr. Pickrell was on January 14, 2013,[29] and Dr. Pickrell had adjusted Adkins' medications.  (CF at 147).  Dr. Sherman observed that there was no documentation of active joint inflammation or loss of function on January 14, 2013.  (CF at 147).

---

[26]  Hypothyroidism is a condition wherein the thyroid gland does not produce sufficient thyroid hormone. Common symptoms include fatigue, weight gain, a puffy face, cold intolerance, joint and muscle pain, depression, and a slowed heart rate.  *Hypothyroidism*, NAT'L INST. OF HEALTH (May 9, 2014), http://www.nlm.nih.gov/medlineplus /hypothyroidism.html.

[27]  GERD, also called gastroesophageal reflux disease, occurs when the muscle at the end of the esophagus does not close properly, and contents of the stomach reflux into the esophagus, causing irritation.  *GERD*, NAT'L INST. OF HEALTH (Jan. 26, 2015), http://www.nlm.nih.gov/medlineplus/gerd.html.

[28]  Hypertension is high blood pressure.  *High Blood Pressure*, NAT'L INST. OF HEALTH (Jul. 24, 2014), http: //www.nlm.nih.gov/medlineplus/highbloodpressure.html.

[29]  At the time of his report, Dr. Sherman had not received Dr. Pickrell's notes from the February 6, 2013 appointment with Adkins.

11

He further observed that although Adkins was hospitalized for acute pleuritic pain after her visit with Dr. Pickrell, there was no documentation showing an acute cardiopulmonary event.  (CF at 147). He remarked that Adkins' pleuritic pain was thought to be related to her overlap syndrome.  (CF at 147).

Dr. Sherman concluded, based on his review of the documentation available to him on February 15, 2014, there was no evidence of active physical symptoms that would prevent Adkins from returning to work and performing her sedentary job "on a regular and sustained basis."  (CF at 148).  He explained that he took into consideration that Adkins had not been seen by Dr. Pickrell since January 14, 2013.  He opined that Adkins is under treatment for a rheumatological disorder, but she would have been able to return to her sedentary job duties as of February 11, 2013.  (CF at 148).  Dr. Sherman reported that he attempted to contact Dr. Pickrell on three occasions and left a voice message on Dr. Pickrell's cell phone.  (CF at 147).  The calls and message were not returned. (CF 147).

Adkins received a letter from Sedgwick dated February 21, 2013 notifying her that her short-term disability benefits had been terminated effective February 11, 2013.  (CF at 174).  The letter summarized Dr. Sherman's findings and stated that Sedgwick's determination was also based on Dr. Pickrell's February 6, 2013 notes.  (CF at 174).  According to Sedgwick, the medical information Adkins provided "did not clearly indicate a severe functional impairment preventing [Adkins] from performing the essential functions of [her] job."  (CF at 174).

## E.    Adkins' Appeal of Termination of Benefits

On February 23, 2013, Adkins appealed the decision to terminate her short-term disability benefits.  (CF at 166).  Adkins timely submitted an appeal form and a handwritten letter.  (CF at

175–82).  The letter summarized the events leading up to the termination of her benefits, including her diagnoses and symptoms.  Adkins also maintained that she was "still very ill, fatigue, vomiting, nausea, shortness of breath, loss of memory, and chronic pain and swelling." (CF at 175).  She also wrote that she is on several different medications, and that Dr. Pickrell had not yet found a medication sufficient to stabilize her condition so that she could function and conduct normal daily activities.  (CF at 175).  She stated that the past three years have been extremely difficult emotionally and financially due to her illnesses.  (CF at 181).

Adkins included with her appeal the progress note from her February 6, 2013 visit with Dr. Pickrell and another progress note from Dr. Pickrell, dated March 13, 2013.  (CF at 177, 277).  In the March 13, 2013 note, Dr. Pickrell recounted Adkins' medical history as previously documented in his progress notes.  (CF at 277).  Dr. Pickrell noted that Adkins had also been treated by Dr. Asim S. Aijaz ("Dr. Aijaz"), a medical doctor at Austin Pain Associates, and is prescribed a variety of narcotic analgesics.  (CF at 277).  Dr. Pickrell added that Adkins "continues to be literally exhausted" and found it very difficult to "do simple activities of daily living" or keep her eyes open during her appointment with him.  (CF at 277).  Dr. Pickrell also indicated that he prescribed Adkins Celexa[30] to help with her mild depression and fatigue, but that it was not helpful.  (CF at 277). However, he clarified that she was in "no acute distress." (CF at 277).  Dr. Pickrell also observed that Adkins had tenderness across numerous joints and on her upper neck, back, and shoulders, but "no obvious synovitis per se." (CF at 277).  He further explained that Adkins suffered from

---

[30] Celexa is a brand-name antidepressant, generically called citalopram.  Common side effects include nausea, diarrhea, constipation, vomiting, decreased appetite, weight loss, excessive tiredness, and muscle or joint pain. *Citalopram*, NAT'L INST. OF HEALTH (Jan. 26, 2015), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html.

intermittent pleurisy, which was reasonably controlled with prednisone, and her chest films were unremarkable.  (CF at 277).

Also contained in Adkins' appeal record was a plan of treatment from a visit on March 4, 2013 with Dr. Aijaz.  (CF at 197).  The plan of treatment indicated Adkins was given new prescriptions for Exalgo[31] and Cymbalta,[32] and was to continue taking Opana[33] and Gralise.[34]  (CF at 97).  The plan of treatment did not include any assessment or diagnosis information.[35]

## F.     Second Medical Record Review and Denial of Appeal

Sedgwick submitted Adkins' appeal and medical records to NMR for a second review.  NMR referred Adkins' file to four physicians for their review and report.  Each NMR physician reviewed Adkins' file on March 29, 2013.  (CF at 284, 289, 293, 298).

### 1.     Dr. Dennis Payne's Report

Dr. Dennis Payne ("Dr. Payne") is a medical doctor board certified in internal medicine and rheumatology.  (CF at 284).  Dr. Payne summarized Adkins' medical file, noting her systemic lupus, myofascial pain, gastroparesis, obstructive sleep apnea, possible pleurisy, and depression.  (CF at

---

[31] Exalgo is a brand-name pain medication, generically called hydromorphone.  Side effects include nausea, vomiting, headache, difficulty sleeping, dry mouth, drowsiness, muscle and joint pain, and depression.  *Hydromorphone*, NAT'L INST. OF HEALTH (Jan. 26, 2015), http://www.nlm.nih.gov/medlineplus/druginfo/meds /a682013.html.

[32] Cymbalta is a brand-name depression medication, generically called duloxetine, which is also sometimes used to treat muscle and joint pain.  Side effects include nausea, vomiting, constipation, diarrhea, heartburn, stomach pain, decreased appetite, dry mouth, sweating, tiredness, weakness, and muscle pain.  *Duloxetine*, NAT'L INST. OF HEALTH (Jan. 26, 2015), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html.

[33] Opana is a brand-name pain medication, generically called oxymorphone.  *Supra* n.7.

[34] Gralise is a brand-name medication, generically called gabapentin.  *Supra* n.8.

[35] Also included in the appeal record are Endoscopy Discharge Instructions from Dr. Imtiaz Alam, a medical doctor at North Austin Surgery Center.  (CF at 213).  The document indicated that Adkins underwent a gastroscopy (EGD) on August 10, 2012.  (*Id.*).  However, neither party discussed the significance of the gastroscopy or placed weight on its occurrence.

283).  Dr. Payne states in his report that Dr. Pickrell noted Adkins had musculoskeletal pain, fatigue, and achy joints, but no clear inflammatory historical data or synovitis.  (CF at 283).  He recounted she had tenderness in the chest wall. (CF at 283).  Dr. Payne also summarized that Adkins' tests show positive ANA, SSA, and SSB antibodies.  (CF at 283).

Dr. Payne also remarked that Adkins complained of joint pain and chest pain on February 6, 2013, after she was hospitalized, but a CT scan of her chest and EKG were normal.  (CF at 283). He characterized the various test results from her emergency room visit as normal but noted the possibility of pleurisy.  (CF at 283).  He also stated that he reviewed the March 4, 2013 notes from Austin Pain Associates.  (CF at 283).

Based on his review of Adkins' medical records, Dr. Payne concluded that from a rheumatology viewpoint, Adkins was capable of performing her regular job duties because no data supports an impairment in function.  (CF at 283–84).  He reasoned the clinical findings in the records are "limited to the somatic symptoms including diffuse pain and fatigue."  (CF at 283–84).   He observed that Adkins' visit with Dr. Pickrell on March 13, 2013 produced normal lab results "other than positive serologies [for ANA and  Sjögren's antibodies], which are non-specific in this setting." (CF at 283).

### 2.    Dr. Charles Brock's Report

Dr. Charles Brock ("Dr. Brock") is a medical doctor board certified in neurology and pain management.  (CF at 289).  Dr. Brock summarized Adkins' medical file as including a diagnosis of myofascial pain, overlap syndrome characterized by features of lupus,  Sjögren's syndrome, and possible rheumatoid arthritis.  (CF at 287).  Dr. Brock's report states that Adkins reports having total body pain, "tenderness in the shoulder, hips, and knees" and "across the metatarsal pads of both feet

and across the heels." (CF at 287).  He commented that the medical records indicated Adkins has marked fatigue and reports joint pain.  (CF at 287).  He recounted that Adkins experienced abdominal pain and bloating due to her severe underlying gastroparesis.  (CF at 287).  Dr. Brock further indicated that Adkins experienced swelling and stiffness of multiple joints, slight fullness across fingers and wrists, and explained that it is unclear whether the condition is synovitis or edema. (CF at 287).  Dr. Brock remarked that Adkins was on a combination of analgesics and indicated that treatment providers recommended ongoing therapy to treat Adkins' level of pain control.  (CF at 287).

After reviewing Adkins' medical records, Dr. Brock concluded that the medical records "do not support delineation, restriction and limitation from a sedentary vocation."  (CF at 287).  He reasoned that although the medical records indicate slight swelling of the joints, the medical records do not "otherwise demonstrate any objective specific abnormality in regard to range of motion, functional endurance, strength, sensory, reflect, coordination, or cognition."  (CF at 288).  He also pointed out that the medical records do not support an inability to do sedentary work.  (CF at 288). He therefore concluded that from a "pain management perspective," the medical records did not support a disability finding.  (CF at 288).

Dr. Brock therefore concluded that Adkins was not disabled from her regular employment as of February 11, 2013.  (CF at 288).  Dr. Brock called Dr. Aijaz's office twice and left messages with the office assistant, but never received a call back.  (CF at 286).

### 3.     Dr. Jose A. Perez Jr.'s Report

Dr. Jose A. Perez Jr. ("Dr. Perez") is a medical doctor board certified in internal medicine. (CF at 293).  Dr. Perez also summarized Adkins' medical history as including diagnoses of systemic

lupus, overlap syndrome,  Sjögren's syndrome, myofascial pain, gastroparesis, obstructive sleep apnea, and depression.  (CF at 291).  He recounted that in Dr. Pickrell's physician statement on October 10, 2012, Dr. Pickrell stated that Adkins could not sit or stand for more than ten minutes at a time.  (CF at 291).  He also remarked that Adkins was hospitalized on February 5, 2014, and that she was diagnosed with acute chest pain due to pleuritis.  (CF at 291).  Dr. Perez further remarked that he spoke with Dr. Pickrell, and that Dr. Pickrell indicated Adkins' major diagnoses were lupus and severe myofascial pain that required narcotics.  (CF at 290).  He also left a voicemail for Dr. Alam that was not returned.[36]  (CF at 290–91).

Dr. Perez indicated that from an internal medicine perspective, the relevant diagnoses are gastroparesis and obstructive sleep apnea.  (CF at 292).  He clarified that the evaluations on November 26, 2012 by Dr. Pickrell were outside of his area of expertise, and explained that Adkins' other conditions are outside the scope of this review.  (CF at 291, 292).  He mentioned the gastroparesis was treated with the implantation of a nerve stimulator,[37] there was no evidence of diabetes, and no evidence that Adkins' obstructive sleep apnea caused her disabling somnolence. (CF at 292).  He concluded that from an internal medicine perspective, the information provided did not establish a disabling impact on Adkins' ability to function and she was not disabled as of February 11, 2013. (CF at 292).

---

[36] Dr. Alam is a medical doctor at North Austin Surgery Associates who apparently performed a gastroscopy on Adkins in 2012.  *Supra* n.24.

[37] Adkins' gastroparesis was treated using a nerve stimulator, also called a gastric stimulator.  (CF at 106).  A gastric stimulator sends electrical stimulation to the stomach to enhance the stomach contractions necessary for digestion. *Gastroparesis*, AM. COLL. OF GASTROENTEROLOGY (Dec. 2012), http://patients.gi.org/topics/gastroparesis/.

17

**4.      Dr. Michael A. Rater**

Dr. Michael A. Rater ("Dr. Rater") is a medical doctor board certified in psychiatry.  (CF at 298).  He summarized Adkins' medical history diagnoses as lupus, myofascial pain, probable mixed connective tissue disease, gastroparesis, obstructive sleep apnea, and depression.  (CF at 294–95).  He noted her hospital visit in September 2012, wherein she was discovered to have high titer ANA and markedly positive SSA and SSB antibodies.  (CF at 295).  He observed that she had some component of  Sjögren's and lupus overlap syndrome.  (CF at 295).  He further commented that Adkins had total body pain, swelling and stiffness of joints, fatigue, and difficulty concentrating.  (CF at 295).

Based on his review of the medical records, Dr. Rater concluded, "The findings do not show that [Adkins'] psychiatric condition impacts her work capacity."  (CF at 298).  He stated her depression is caused by her situation and "because she cannot work."  (CF at 298).  He assessed her depression as distinct from major depression, and the treatment for her depression as adjunctive.  (CF at 298).  Dr. Rater called Dr. Pickrell and left a message with his assistant, but his call was not returned.  (CF at 294).

In sum, all of the NMR physicians[38] concluded that Adkins did not have a disability within the meaning of the Plan that would prevent her from performing her job functions as of February 11, 2013.[39]  On April 8, 2013, Adkins received letter notifying her that Sedgwick denied her appeal based on its review of Adkins' medical records and the NMR physicians' conclusions.  (CF at

---

[38]  The NMR physicians are Dr. Sherman, Dr. Payne, Dr. Brock, Dr. Perez, and Dr. Rater.

[39]  Each NMR physician certified that there was no conflict of interest relating to his determination because he does not accept compensation that is dependent on the outcome of the case and he does not have a conflict of interest with any entity or party involved in the determination. (CF at 149, 284, 288, 292, 298).

308–10).  The letter summarized each NMR physicians' findings and concluded that "although some findings are referenced, none are documented to be so severe as to prevent you from performing the duties of your job."  (CF at 310).  Adkins filed this lawsuit on January 27, 2014.  (Clerk's Dkt. No. 1).

## IV.  ANALYSIS

Adkins brings this action seeking to overturn the benefits determination made by Sedgwick. ERISA permits a person denied benefits under an employee benefit plan to challenge that denial in federal court.  *See* 29 U.S.C. § 1132(a)(1)(B) (beneficiary may bring suit to enforce rights under benefit plan); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (person denied benefits may challenge denial in federal court).  Where a plan governed by ERISA grants the administrator "'discretionary authority with respect to the decision at issue," review of a denial of benefits is for abuse of discretion.  *Corry v. Liberty Life Assurance Co.*, 499 F.3d 389, 397 (5th Cir. 2007); *Vercher v. Alexander & Alexander, Inc.*, 379 F.3d 222, 226 (5th Cir. 2004).

It is undisputed in this case that the abuse of discretion standard is the proper standard of review of the decision to terminate Adkins' disability benefits.  Under the abuse of discretion standard, "[i]f the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail."  *Killen v. Reliance Standard Life Ins. Co.*, __F.3d__, 2015 WL 127379, at *3 (5th Cir. 2015) (citing *Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262, 273 (5th Cir. 2004)).  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id*. (internal citations omitted).  An arbitrary or capricious decision is one "made 'without a rational connection between the known facts and the decision or between the found facts and the evidence.'"

19

*Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 539 (5th Cir. 2012) (quoting *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246 (5th Cir. 2009)).  However, the Court's review of a claim decision is "limited to the evidence that was before the plan administrator when he made his decision to deny benefits."  *S. Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 101 (5th Cir. 1993).

Defendant argues the plan fiduciary's decision is supported by substantial evidence because five reviewing doctors, Dr. Sherman, Dr. Payne, Dr. Brock, Dr. Perez, and Dr. Rater, concluded Adkins was not disabled as of February 11, 2011.  Adkins argues the Sedgwick abused its discretion because Sedgwick and the NMR physicians ignored her written statements and her physicians' medical records regarding her symptoms and diagnoses.  Accordingly, she maintains the NMR physicians' and Sedgwick's conclusions that she was able to perform her job duties as of February 11, 2013 are not rationally connected to the evidence.

As a preliminary matter, it appears Adkins asserts that she presented evidence to support her disability claim, which was ignored by the NMR physicians and Sedgwick.  However, the amount of evidence Adkins can produce is irrelevant.  "The law requires only that substantial evidence support a plan fiduciary's decisions, including those to deny or to terminate benefits, not that substantial evidence (or, for that matter, even a preponderance) exists to support the employee's claim of disability."  *Dudley v. Sedgwick Claims Mgmt. Serv's Inc.*, 495 F. App'x 479, 477 (5th Cir. 2012) (quoting *Ellis*, 394 F.3d at 273).  Nevertheless, the NMR physicians did not ignore Adkins' various symptoms and diagnoses.  Each NMR physician carefully summarized Adkins' medical history, including her fatigue, chronic pain, gastroparesis, depression, and joint swelling and

tenderness.[40]  *See McDonald v. Hartford Life Group Ins. Co.*, 361 F. App'x 599, 612 (5th Cir. 2010)

(quoting *Corry*, 499 F.3d at 401) (administrator did not abuse discretion where administrator and

reviewing physicians "clearly 'considered, evaluated, and addressed' [claimant's] subjective

complaints"); *Corry*, 499 F.3d at 399–401 (administrator properly relied on independent experts'

opinions where experts reviewed treating physician's conclusions and subjective complaints).

Adkins contends the NMR physicians failed to properly take into consideration her

gastroparesis, depression, swelling and tenderness of her joints, and failed to consider her diagnoses

collectively to determine their effect on her ability to perform her work.  As Defendant notes, a

diagnosis alone is insufficient to support a disability finding.  *See Hernandez v. SBC Comm., Inc.*,

265 F. App'x 276, 278 n.3 (citing *Dennis v. Standard Ins. Co.*, 1994 WL 721840 (9th Cir. Dec. 29,

1994)) ("[M]ere diagnosis of chronic fatigue syndrome without showing of impairment is

insufficient to find an abuse of discretion.").  There must be documented evidence of an inability to

conduct the essential job functions.  *See id.*  (listing cases holding administrator did not abuse

discretion when claimant was diagnosed with illness but there was lack of objective testing and no

showing of actual impairment).

Each NMR physician noted an absence of objective information regarding Adkins' mobility

or functionality.  Dr. Payne concluded, "From an objective rheumatology viewpoint, the data does

not support restrictions or limitations . . . . No findings in this file . . . would support an impairment

---

[40]  Adkins also contends that the NMR physician failed to consider the heavy medications prescribed to her or that the medications "masked" her lupus/Sjögren's overlap syndrome symptoms.  She maintains it was therefore unreasonable to reach the conclusion that she could drive an hour to work and sit, talk, or type, for eight hours and safely drive home.  However, as Defendant points out, Dr. Pickrell did not document or opine in his reports that Adkins' medications caused her to be unable to perform the functions of her work or otherwise impair her.  Defendant also correctly notes that Adkins' argument that she was unable to drive to and from her work is irrelevant because the commute to and from work are not essential functions of her job within the meaning of the Plan.  (Plan at 11).

in function." (CF at 283–84).  Dr. Brock similarly remarked the medical records do not "otherwise demonstrate any objective specific abnormality in regard to range of motion, functional endurance, strength, sensory, reflect, coordination, or cognition." (CF at 288).  Dr. Perez opined, "Based on the information provided, from an [internal medicine] perspective, there is no disabling impact on the claimant's ability to function in her regular job." (CF at 292).  Finally, Dr. Rater observed, "The findings do not show that [Adkins'] psychiatric condition impacts her work capacity." (CF at 298).  *See Corry*, 499 F.3d at 399 (focus on absence of objectively verifiable medical evidence of disability is not abuse of discretion).

Moreover, although Dr. Pickrell documented his medical conclusions regarding Adkins' mobility and ability to return to work during her first three appointments with him, he failed to document any conclusions regarding her mobility, functionality, or ability to work in any medical record thereafter.  (*See* CF at 98, 106, 104) (on October 10, 2012, Adkins was unable to sit or stand for more than ten minutes; on October 22, 2012, it was impossible for Adkins to return to work; on November 5, 2012, Adkins showed limited mobility).  *See Chandler v. Hartford Life*, 178 F. App'x 365, 368 (5th Cir. 2006) (no abuse of discretion where reviewing physician noted documentation of joint pain, but found no documentation of loss of mobility).  In fact, in Dr. Pickrell's notes on February 6, 2013, he wrote that Adkins' hips, knees, and ankles showed "fair mobility." (CF at 202).

Additionally,  Defendant  properly  apprised  Adkins  and  her  treating  physicians  that documentation of functionality was required.  Under the Plan, Adkins was responsible for giving a document entitled "Instructions to the Physician" to her treating physician, and that Dr. Pickrell received the Instructions.  (CF at 62, 103).  The Instructions to the Physician stated, "medical reports

should include but are not limited to the following information: . . . [l]evel of functionality (restrictions and limitations)." (CF at 70). Accordingly, Adkins and her treating physicians were given notice that medical records documenting Adkins' level of functionality were required to support her disability claim. The NMR physicians' conclusions that there was insufficient objective evidence to support a disability finding are therefore reasonable. *See Corry*, 499 F.3d at 399–401 (when evidence of claimant's pain largely based on self-reporting, experts do not abuse discretion in focusing on absence of objectively verifiable evidence of disability).

Adkins further maintains the NMR physicians and Sedgwick failed to take into consideration her fatigue and chronic pain, both of which are often symptoms of lupus/Sjögren's syndrome. The undersigned does not question the veracity of Adkins' statements; however, the administrator is not required to rely on subjective or self-reported evidence, and may require the production of objective evidence documented by a physician and based on medical examinations. *See Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 515 (5th Cir. 2010) ("[plan administrator] did not abuse its discretion by relying on the independent experts' opinion that [claimant] had not offered objective clinical proof showing the functional effect of his [condition]"); *Corry*, 499 F.3d at 399–400 (administrator did not abuse its discretion where claimant's symptoms were self-described and physicians focused on absence of objectively verifiable evidence). Although Adkins' fatigue and chronic pain were in fact noted in the medical records, the extent and severity of Adkins' pain was supported by her subjective statements to her treating physicians. *See Anderson*, 619 F.3d at 514 (no abuse of discretion where independent experts did not misread claimant's records or dismiss subjective complaints, and simply found subjective complaints "insufficient to support a total disability"); *but see Audino v. Raytheon Co. Short Term Disability Plan*, 129 F. App'x 882 (5th Cir. 2005) (abuse of discretion where

administrator ignored claimant's subjective complaints of pain and minimized evidence of disability and claimant presented specific evidence of reviewing experts' misstatements and oversights).

However, even if the medical records had included objective medical evidence, such as mobility tests, and recent opinions regarding Adkins' ability to perform her work, the NMR physicians and Sedgwick "are not obligated to accord special deference to the opinions of treating physicians." *McDonald*, 361 F. App'x at 610 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003)). "[T]he Supreme Court has explicitly disapproved of a 'treating physician' rule in the ERISA context and held that 'plan administrators are not obligated to accord special deference to the opinions of treating physicians.'" *McDonald*, 361 F. App'x at 610 (quoting *Black & Decker*, 538 U.S. at 825). "Administrators do not bear 'a heightened burden of explanation . . . when they reject a treating physician's opinion.'" *Id.* (quoting *Black & Decker*, 538 U.S. at 830). "'So long as the [p]lan [a]dministrator's decision is rationally related to the evidence, we do not require the [p]lan [a]dministrator to credit a particular area of expertise when deciding on an applicant's prognosis.'" *Id.* (quoting *Holland*, 576 F.3d at 249–50). *See Becknell v. Long Term Disability Plan for Johnson & Johnson*, 510 F. App'x 317, 320–22 (5th Cir. 2013) (treating physicians' opinions, claimant's extensive medical history, and claimant's subjective complaints of pain were insufficient to support abuse of discretion finding because administrator has no duty to give more weight to treating physicians' opinions than reviewing experts' opinions which concluded claimant could return to work); *Dubose v. Prudential Ins. Co. of Am.*, 85 F. App'x 371, 372 (5th Cir. 2003) ("Although Dubose's primary treating physician found him to be totally disabled, the record shows that Prudential rejected the disability finding as not supported by objective medical evidence. Substantial evidence supports the disability determination.").

24

Adkins is correct that it can be an abuse of discretion to "arbitrarily refuse to credit a claimant's reliable evidence." *Black & Decker*, 538 U.S. at 834 (2003). Yet it is also true that a "plan administrator abuses its discretion where the decision is not based on evidence, *even if disputable*, that clearly supports the basis for its denial." *Holland*, 576 F.3d at 246 (emphasis added). As discussed above, the evidence provided by Adkins was considered and addressed by the NMR physicians. The NMR physicians specifically stated their reasons for concluding the medical record did not support a finding of disability—namely, that there was a lack of objective evidence regarding Adkins' mobility and ability to conduct her job duties. Sedgwick therefore properly relied on the NMR physicians' findings, and Sedgwick's decision to terminate short-term disability benefits were supported by substantial evidence. It therefore "cannot be said that there is no rational connection between the administrator's found facts and the evidence," particularly because there is a lack of evidence supporting the conclusion that Adkins' physical abilities are so limited to disallow her from performing a sedentary job. *Chandler*, 178 F. App'x at 369–70. Adkins has thus failed to show Sedgwick's weighing of the evidence in this case was an abuse of discretion. *See Corry*, 499 F.3d at 398 (quoting *Vega v. Nat'l Life Ins. Serv's, Inc.*, 188 F.3d 287, 297 (5th Cir. 1999) (*overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)) (review of administrator's decision need only assure the decision was "somewhere on a continuum of reasonableness—even if on the low end"). *See also Anderson*, 619 F.3d at 511 (administrator did not abuse discretion in denying benefits where underlying evidence was mixed); *McDonald*, 361 F. App'x at 613–14 (administrator had discretion to investigate claim and draw conclusions based on evidence presented); *Holland*, 576 F.3d at 250 (job of weighing conflicting evidence is job of ERISA plan administrator, administrator not legally obligated to weigh any specific opinion more than another);

25

*West v. UNUM Provident*, 275 F. App'x 292, 295 (5th Cir. 2008) (finding no error in consultation of variety of experts, including occupational therapist).

Because there has been no showing that Sedgwick abused its discretion in terminating Adkins' short-term disability benefits, Defendant's motion for summary judgment should be granted. Adkins' motion for summary judgment should be denied. *See Corry*, 499 F.3d at 402 (citing *Ellis*, 394 F.3d at 273) ("It seems indisputable that the medical opinions of [three medical consultants], each of whom are specialists and qualified experts in fields specifically related to [the claimant's] symptoms, constitute substantial evidence supporting [the administrator's] determination that [the claimant] has no disability that would preclude her from performing sedentary work.").

## V.  RECOMMENDATION

The undersigned **RECOMMENDS** that the District Court **GRANT** Defendant's Motion for Summary Judgment (Clerk's Dkt. No. 19).  The undersigned **FURTHER RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Summary Judgment (Clerk's Dkt. No. 21).

## VI.  OBJECTIONS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections.  *See Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from

appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150–53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

**SIGNED** on February 13, 2015.

_____
MARK LANE
UNITED STATES MAGISTRATE JUDGE